## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DAVID CAICEDO; RAJIB
CHOWDURY; and FLORIDA RISING
TOGETHER, INC.,

     *Plaintiffs*,

v.

RON DESANTIS, in his official capacity
as Governor of the State of Florida,

     *Defendant*.

**Case No. _____**

## **COMPLAINT**

### **Preliminary and Permanent Injunctive Relief Requested**
### **Declaratory Relief Requested**

1.    This lawsuit seeks injunctive and declaratory relief to prevent Governor Ron DeSantis from effectively disenfranchising almost 400,000 voters in violation of rights protected by the First and Fourteenth Amendments of the U.S. Constitution.

2.    In 2020, Monique Worrell, a former public defender and law professor, ran as a reform-minded candidate for State Attorney in the Ninth Judicial Circuit, Florida's third largest judicial circuit encompassing Orange and Osceola counties. She pledged to implement a series of policies geared toward achieving a fairer, more

equitable criminal legal system and a safer community. The reforms she championed included holding police officers accountable, curtailing the use of cash bail, expanding programs to divert children and adults away from jail and prison, and addressing mental health and substance abuse issues.

3.      Residents of the Ninth Judicial Circuit rallied behind and cast their ballots in support of Ms. Worrell and her agenda. Ms. Worrell achieved a resounding victory, garnering nearly 67% of the vote.

4.      A total of 395,979 voters voted for Ms. Worrell.

5.      Upon assuming office on January 5, 2021, Ms. Worrell moved forward with implementing many of her campaign promises, by—among other measures— adopting new policies for improving the reliability of the government's law enforcement witnesses, tracking instances of officer misconduct, expanding diversion programs, and creating specialized units addressing the root causes of crime in the community, such as substance abuse.

6.      From the beginning of Ms. Worrell's term in office, for political and ideological reasons, Governor DeSantis—who belongs to a different political party from Ms. Worrell (Governor DeSantis is a Republican, while Ms. Worrell is a Democrat)—was resistant to accepting the will of the voters and hostile toward Ms. Worrell's reform agenda. In the aftermath of Ms. Worrell's election, Governor DeSantis expressed his strong opposition to her policies, launched investigations

into her prosecutorial decisions, and used the bully pulpit of the governorship to distort her record on combating crime.

7.      On August 9, 2023, Governor DeSantis suspended Ms. Worrell from office without a shred of credible evidence to support his allegations of "neglect of duty" and "incompetence"—the purported grounds for her suspension.

8.      Governor DeSantis's baseless suspension of Ms. Worrell effectively disenfranchised the voters who elected her and seriously undermined the fundamental fairness and integrity of the electoral process.

## PARTIES

9.      Plaintiff David Caicedo is an Orlando resident who voted for Ms. Worrell in 2020.

10.     Plaintiff Rajib Chowdhury is an Orlando resident who voted for Ms. Worrell in 2020.

11.     Plaintiff Florida Rising Together, Inc. ("Florida Rising") is an organization with a mission to increase the voting and political power of marginalized communities. Since its founding, Florida Rising has engaged its constituencies to expand democracy by ensuring that every eligible voter in the state is able to exercise their fundamental and constitutionally protected right to vote. In furtherance of its goals, Florida Rising actively engages in voter registration, education, engagement, and election protection programming.

12.     Florida Rising's members include residents of Orange and Osceola counties who voted for Ms. Worrell during the November 2020 election.

13.     Defendant Ron DeSantis currently serves as the Governor of the State of Florida. He is sued in his official capacity. Governor DeSantis suspended Ms. Worrell from the position of state attorney pursuant to Art. IV, § 7(a) of the Florida constitution and acted under color of state law at the time of the suspension. Governor DeSantis has the power to reinstate Ms. Worrell at any time prior to her removal from office. Fla. Const. Art. IV, § 7(a).

## JURISDICTION AND VENUE

14.     This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1357 as well as 42 U.S.C §§ 1983 and 1988 because this action arises under the Constitution and laws of the United States.

15.     This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure to grant the declaratory and injunctive relief requested.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

17.     This action is properly filed in the Orlando Division pursuant to Local Rule 1.04(b) because the action is most directly connected with this Division, and it is most conveniently advanced there.

4

18.     The Court has personal jurisdiction over the Defendant.

## FACTUAL ALLEGATIONS

**A. Orange and Osceola voters supported and elected a reform-minded prosecutor.**

19.     Monique Worrell ran with a promise to reform the criminal legal system in Orange and Osceola counties.

20.     She pushed an ambitious reform agenda. She promised to focus on solution-based justice, prioritize public safety, actively engage the community, advocate for legislative change, and work to reduce mass incarceration.

21.     She pledged to implement policies that would hold police officers accountable, curtail the use of cash bail, expand programs to divert children and adults away from jail and prison, and partner with community programs to address mental health and substance abuse issues.

22.     Local racial justice organizations who have advocated for much-needed reforms to the criminal legal system actively supported Ms. Worrell's campaign.

23.     Local officials, community groups, and newspapers enthusiastically endorsed her.

24.     In its endorsement of Ms. Worrell, the *Orlando Sentinel* stated that Ms. Worrell "wants punishment to be defined more by fairness and less by how many people you lock up, particularly people who commit non-violent crimes." The paper

also noted that Ms. Worrell wanted to try "harder to understand and change the root cause of crime" and designed her campaign around solving problems.

25.     During the November 2020 election, voters overwhelmingly approved Ms. Worrell's reform agenda. Nearly 400,000, or almost 67% of voters cast their ballot for Ms. Worrell.

**B. Ms. Worrell followed through on her campaign promises**.

26.     Ms. Worrell followed through on her campaign promises.

27.     She implemented new policies designed to prevent officers lacking in credibility from testifying. Specifically, she created a "Brady database," named for the landmark case *Brady v. Maryland*, 373 U.S. 83 (1963), to aggregate data from multiple sources to identify unreliable officers to disqualify them from testifying.

28.     She created a procedure regarding investigations into officer-involved incidents to ensure transparency and integrity in the process.

29.     She also focused on devising innovative approaches to combatting violent crime. She jointly applied for funding with the Orlando Police Department for a grant to reduce gun violence; she partnered with community and law enforcement on a Gang Task Force; and she created a special team tasked with handling and resolving violent crime in Orange and Osceola counties.

30.     She formed a narcotics unit to combat an increase in fentanyl overdoses. The unit conducted targeted prosecutions and provided alternatives to incarceration.

31.     She reduced the use of direct file—a process by which the state transfers juvenile cases to adult court for the most serious offenses—to bring a rehabilitative approach to the juvenile legal system.

32.     Ms. Worrell created a six-month pilot diversion program for adults with first-time misdemeanor charges to test the efficacy of the program. She also created a mental health unit aimed at addressing the needs of individuals suffering from mental illness.

33.     Ms. Worrell centered the voters who elected her. She established a task force to work with community partners to identify alternatives to incarceration for those charged with offenses related to homelessness. She also created a community prosecution program to work with community partners to reduce incidences of crime and improve residents' quality of life.

34.     In 2022, she relaunched the "Power of the Prosecutor Podcast," a podcast where she had monthly conversations with local officials and community members about community engagement, victim advocacy, and the criminal legal system.

35.     During Ms. Worrell's brief tenure in office, the crime rates in Osceola and Orange counties improved. Florida Department of Law Enforcement data shows that crime rates in the Ninth Judicial Circuit dropped by nearly 10% in 2021 compared to 2020. Murders dropped about 13% during the same period. The crime rate in Orange and Osceola counties dropped 9% and almost 11%, respectively.

36.     In August 2023, just before Ms. Worrell's suspension, the Chief of Police of Orlando, the largest city in the Ninth Judicial Circuit, said that violent crime was down 10% compared to 2022 and shootings were down 30% from the prior year.

## C. Governor DeSantis suspended Ms. Worrell over ideological and political differences.

37.     Ms. Worrell's reform-minded approach made her a target for Governor DeSantis.

38.     Despite the success of Ms. Worrell's policies and widespread community support, Governor DeSantis directed his general counsel to request information from her office about individual cases and her office's charging decisions.

39.     In February 2023, Governor DeSantis's general counsel sent a letter to Ms. Worrell's office requesting information relating to a series of shootings in Pine Hills, an unincorporated subdivision in Orange County.

40.     The letter blamed Ms. Worrell for the crime, accusing her of allowing the suspect to "remain on the streets after multiple arrests, including one your office has refused to prosecute."

41.     In addition to requesting information about the suspect himself, the letter also requested unrelated information about other individuals her office did not prosecute.

42.     Ms. Worrell issued a press release in response to the letter attempting to correct misconceptions and insinuations that her policies promoted crime. With respect to the suspect inquired about, Ms. Worrell clarified that during her administration, police arrested him only once for misdemeanor possession of marijuana, a crime for which her office had no conclusive proof. Prior arrests of the suspect occurred before Ms. Worrell's administration, and none were for serious offenses that could have gotten him "off the streets" through the imposition of a lengthy prison sentence.

43.     In March 2023, Ms. Worrell released data demonstrating she did not prosecute any fewer cases than two of her predecessors.

44.     In May 2023, the *Orlando Sentinel* Editorial Board published an editorial forecasting that Governor DeSantis's vendetta against Ms. Worrell would lead to her suspension and undermine not only voters but the process of justice in Orange and Osceola counties.

45.     On August 9, 2023, Governor DeSantis issued Executive Order 23-160 suspending Ms. Worrell and naming Andrew Bain, an individual Governor DeSantis appointed to the bench in 2020, as her successor.

46.     In his Executive Order, Governor DeSantis stated that "during Ms. Worrell's tenure in office, the administration of criminal justice in the Ninth Circuit has been so clearly and fundamentally derelict as to constitute both neglect of duty and incompetence."

47.     The suspension order itself establishes that it was prompted by the Governor's ideological and political disagreements with Ms. Worrell and his opposition to how she was exercising her prosecutorial discretion. Although the order accused her of "incompetence" and "neglect of duty," it failed to identify even a single instance of abuse of prosecutorial discretion, malfeasance, or misconduct. Instead, the order included generalized complaints about Ms. Worrell's policies and practices.

48.     Additionally, early drafts of Governor DeSantis's executive order suspending Ms. Worrell reference George Soros, who provided funding to Democratic candidates including Ms. Worrell. In presidential fundraising emails and in speeches, Governor DeSantis has boasted that he is the "only elected official in America to remove a 'progressive' Soros-funded district attorney," a reference to his suspension of Andrew Warren, who also was backed by George Soros. Although

Governor DeSantis's final executive order suspending Ms. Worrell did not include this reference, it need not be included for his motivations to be clear.

**D. Governor DeSantis suspended Ms. Worrell for doing nothing more than exercising her prosecutorial discretion, a discretion intrinsic to the criminal legal system.**

49.     The Florida Constitution provides that a state attorney has complete discretion in deciding whether and how to prosecute.

50.     Prosecutorial discretion is so intrinsic to the legal system that both the Florida Rules of Professional Conduct and the American Bar Association provide for the special responsibilities of a prosecutor in exercising this discretion.

51.     The commentary to Rule 4-3.8 of the Florida Rules of Professional Conduct requires a prosecutor to act as "a minister of justice" and states that the systematic abuse of prosecutorial discretion violates the Rules of Professional Conduct.

52.     Likewise, Standard 3-1.2 of The American Bar Association Standards for the Prosecution Function ("ABA Standards") provides that a prosecutor is both "an administrator of justice" and a "zealous advocate" that should "exercise sound discretion and independent judgment." Moreover, the Standard specifies that the duty of the prosecutor is to "seek justice within the bounds of the law, not merely to convict."

53.     This is because:

[P]rosecutor[s] serve the public interest and should act with integrity and balanced judgment to increase public safety both by pursuing appropriate criminal charges of appropriate severity, and by exercising discretion to not pursue criminal charges in appropriate circumstances. The prosecutor should seek to protect the innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants.

54.     Standard 3-1.2 further states that prosecutors should develop alternatives to prosecution where appropriate, be problem-solvers that consider the "broad goals of the criminal justice system," and "seek to reform and improve the administration of criminal justice" when they are aware of "inadequacies and injustices" in the law.

55.     By following through on her campaign promises to reform the criminal legal system, Ms. Worrell was doing nothing other than meeting her professional and ethical obligations and exercising her inherent prosecutorial discretion.

**E. The Governor has a pattern of retaliating against and suspending duly elected officials who disagree with him.**

56.     Governor DeSantis has a history of targeting elected officials who disagree with him on policy positions.

57.     In May, Governor DeSantis told his supporters at a dinner that while he only earned 50% of the vote, it "entitled [him] to wield 100 percent of the executive power."

58.     Almost a year to the day before he suspended Ms. Worrell, Governor DeSantis used his executive power to suspend another state attorney, Andrew Warren. As in this case, Governor Santis's suspension order included allegations of "neglect of duty" and "incompetence." A federal judge found, however, that Governor DeSantis suspended Mr. Warren solely for political and ideological reasons such as Mr. Warren's "advocacy of positions consistent with the reform-prosecutor viewpoint" and his "affiliation with and receipt of campaign funding from the Democratic Party and, indirectly, from Mr. Soros."

59.     In addition to Ms. Worrell and Mr. Warren, Governor DeSantis has suspended seven other elected officials who were not facing charges: a sheriff, a school superintendent, an elections supervisor, and four school board members.

60.     Six of these seven officials were Democrats, making a total of eight elected Democratic officials removed primarily over political differences.

61.     Governor DeSantis replaced all eight of these elected Democratic officials with Republicans.[1]

62.     While he has targeted Democratic officials, Governor DeSantis has protected his Republican allies, even when they have clearly engaged in

---

[1] Governor DeSantis appointed Wendy S. Link to replace Palm Beach County Supervisor of Elections Susan Bucher. While Link has switched her party affiliation since assuming office, she was a lifetime Republican at the time of her appointment.

malfeasance. For instance, when the Florida Department of Law Enforcement found that Gregory Tony—Governor DeSantis's Republican replacement for Broward's elected Democratic Sheriff—repeatedly lied on his law enforcement applications, Governor DeSantis failed to act.

63.    This pattern of politicizing suspensions is norm shattering. Former Governor Rick Scott, who served two four-year terms, suspended fifteen elected officials from office, only one of whom was not charged with a crime.

64.    Former Governor Jeb Bush, who served two four-year terms, suspended seventeen elected officials, only one of whom was not charged with a crime.

65.    Former Governor Charlie Crist, who served one four-year term, removed thirteen elected officials from office, all of whom were charged with crimes.

**F. Governor DeSantis's suspension of Ms. Worrell is especially suspect because of his history of corruptly controlling and manipulating election outcomes**.

66.    In addition to his unprecedented wielding of executive power, Governor DeSantis and his allies have originated and passed a raft of laws and regulations geared toward making it disproportionately harder for those supporting the Governor's political opponents to vote and participate in the electoral process.

14

67.    In 2019, Governor DeSantis and state Republican leaders passed a law that undermined the historic passage of a 2018 constitutional amendment abolishing the permanent disenfranchisement of people convicted of most felonies. Multiple polls showed a clear majority of Floridians supporting the amendment, which passed by an overwhelming 65% of the vote. With the stroke of his pen, Governor DeSantis signed a law disregarding the voters' choice and effectively *re*-disenfranchising hundreds of thousands of people with felony convictions.

68.     In 2021 and 2022, Governor DeSantis signed two controversial voting bills that reduced access to voting. One of the laws also used unprecedented authority to establish Florida's Office of Election Crimes and Security, a state agency designed to prosecute election crimes despite no evidence of widespread voter fraud.

69.    In early 2022, Governor DeSantis crafted a new law as a response to a political dispute with Disney, using regulatory powers to punish opposing political speech.

70.    In that same year, he used his influence to move a highly partisan redrawing of congressional boundaries through the state legislature, dismantling districts represented by Black Democrats and diluting the voices of people of color.

**G. Governor DeSantis has overridden the will of the voters.**

71.    By appointing Mr. Bain—his ideological ally—to replace Ms. Worrell, Governor DeSantis overrode the will of the voters, substituting his policy

preferences for theirs. Among other measures, Mr. Bain suspended diversion programs and promised to review cases that Ms. Worrell's office had previously declined to prosecute.

72.     The day after Ms. Worrell's suspension many of the same groups and individuals that supported her candidacy and reform-minded policies protested on the steps of Orlando City Hall. A voter at that protest told a reporter he felt that his vote had been disregarded, like it "had been thrown away."

## CLAIMS FOR RELIEF

### COUNT ONE

**Infringement of Voters' Right to Due Process
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

73.     Plaintiffs reallege and reincorporate by reference paragraphs 1-72 above.

74.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, enforceable against state officials acting under color of law pursuant to 42 U.S.C. § 1983, prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."

75.     A substantive due process violation occurs when persons acting under color of state law seriously undermine the fundamental fairness and integrity of the electoral process. *See Duncan v. Poythress*, 657 F.2d 691, 699-700 (5th Cir. 1981)

("The due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."); *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967) (invalidating an election for lacking integrity).

76.     Four factors cited in *Gamza v. Aguire* provide guidance as to whether an election related injury undermines the fundamental fairness and integrity of the electoral process: (1) the nature of the injury; (2) whether the injury was inflicted intentionally or accidentally; (3) whether the injury is part of a pattern that erodes the democratic process; and (4) whether state officials have succumbed to temptations to manipulate or control elections by corruption or violence. 619 F.2d 449, 453 (5th Cir. 1980).

77.     Governor DeSantis's intentional nullification of election results has undermined the fundamental fairness and integrity of the electoral process.

78.     The nature of the injury in this case is egregious. As described *supra*, Governor DeSantis's actions deprived nearly 400,000 people of their fundamental right to vote and threatens the integrity of the state's democratic system.

79.     Moreover, the Governor's words, including his stated explanation for suspending Ms. Worrell, and his actions, including his appointment of a replacement who rejects the policies favored by Ms. Worrell and her supporters, demonstrate that he intended to negate the will of the electorate.

80.     Governor DeSantis's suspension of Ms. Worrell is part of a pattern of conduct that has eroded the democratic process. On nine occasions, he has rejected the results of democratic elections, shunting aside duly elected leaders over policy differences.

81.     Governor DeSantis's suspension of Ms. Worrell is especially suspect because of his history of corruptly manipulating or controlling elections through leading efforts to enact a raft of state laws and rules that have the foreseeable effect of suppressing and diluting the vote of voters disproportionately supportive of his political opponents.

82.     Defendant Governor DeSantis, acting under color of state law, is depriving Plaintiffs of a right secured by the laws of the United States, namely their right to substantive due process.

83.     Plaintiffs have suffered injuries that the relief requested below would remedy.

## COUNT TWO

**Infringement of Voters' Rights to Association and Political Expression
in Violation of the First Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

84.     Plaintiffs reallege and reincorporate by reference paragraphs 1-55 and 71-72 above.

85.     The First Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment and enforceable against state officials acting under color of law pursuant to 42 U.S.C. § 1983, protects both political association and political expression.

86.     The right of association stems from the U.S. Supreme Court's recognition that advocacy is advanced, particularly on controversial points of view, by group association. *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)

87.     The right to associate includes a voter's right to select a "standard bearer who best represents the party's ideologies and preferences.'" *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989). An infringement on that right must be justified by more than a legitimate state interest.

88.     Through voting and attendant voting related activities, citizens have a "voice" and engage in expressive political speech protected under the First Amendment. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("no right is more precious in a free country than that of having a voice in the election of those who make the laws"); *Norman v. Reed*, 502 U.S. 279, 288 (1992) (noting that the right to vote "advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *Doe v. Reed*, 561 U.S. 186, 194-95 (2010) ("An individual expresses a view on a political matter when he signs a petition . . .");

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 134 (2011) (Alito, J., concurring) ("cast[ing] a vote in a straw poll on an important proposal pending before a legislative body . . . indisputably constitutes a form of speech"); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 425 (2010) (Stevens, J., concurring) ("voting is, among other things, a form of speech").

89.     The expressive nature of the fundamental right to vote is nowhere more apparent than when it involves a publicly announced and communicated election outcome where voters have unambiguously expressed and given voice to their political opinions.

90.     It is well established that infringements on core political speech are subject to strict scrutiny. *Meyer v. Grant*, 486 U.S. 414, 420 (1988). The same holds true for limitations on the right to association. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. at 225-26. Consequently, efforts to limit or negate rights to free speech and free association can only survive constitutional scrutiny if they serve a compelling governmental interest. *Id.*

91.     Plaintiffs engaged in their right to associate with other like-minded voters and with their preferred candidate when they voted for Ms. Worrell.

92.     Plaintiffs likewise engaged in a form of political expression when they cast their votes for Ms. Worrell, a reform-minded prosecutor, and their votes contributed to her resounding electoral victory.

93.     Governor DeSantis abrogated Plaintiffs' associational and expressional First Amendment rights when he abused the suspension authority accorded to him under Florida law. In his executive order, he articulated pretextual reasons for setting aside the results of a fair and free election, an election overwhelmingly carried by Ms. Worrell.

94.     Defendant Governor DeSantis, acting under color of state law, is depriving Plaintiffs of rights secured by the laws of the United States, namely, their rights to political association and political expression guaranteed under the First Amendment of the U.S. Constitution.

95.     Plaintiffs have suffered injuries that the relief requested below would remedy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a.  Declare that Executive Order 23-160 violates the Fourteenth Amendment to the U.S. Constitution;

b.  Declare that Executive Order 23-160 violates the First Amendment to the U.S. Constitution;

c.  Preliminarily and permanently enjoin Defendant to reinstate Monique Worrell as State Attorney for the Ninth Judicial Circuit of Florida;

d. Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. §
   1988; and,

e. Grant Plaintiffs such additional and further relief as this Court deems just
   and proper.

DATED: November 30, 2023                      Respectfully submitted,

                                               /s/ *Krista Dolan*
                                              Krista Dolan, Fla. Bar No. 1012147
                                              Matletha Bennette, Fla. Bar No. 1003257
                                              SOUTHERN POVERTY LAW CENTER
                                              PO Box 10788
                                              Tallahassee, FL 32302-2788
                                              krista.dolan@splcenter.org
                                              matletha.bennette@splcenter.org

                                              Bradley E. Heard,* Ga. Bar No. 342209
                                              Avner Shapiro,* DC Bar No. 452475
                                              Courtney O'Donnell,* Ga. Bar No. 164720
                                              Jack Genberg, Fla. Bar No. 1040638
                                              SOUTHERN POVERTY LAW CENTER
                                              150 E Ponce De Leon Ave Ste 340
                                              Decatur, GA 30030-2553
                                              bradley.heard@splcenter.org
                                              avner.shapiro@splcenter.org
                                              courtney.odonnell@splcenter.org
                                              jack.genberg@splcenter.org

                                              *Pro hac vice* motion forthcoming

                                              **Attorneys for Plaintiff**