**United States District Court**
**Middle District of Florida**
**Orlando Division**

|  |  |
|---|---|
| DAVID CAICEDO; RAJIB CHOWDHURY; and FLORIDA RISING TOGETHER, INC., <br><br> *Plaintiffs,* <br><br> **v.** <br><br> RON DESANTIS, in his official capacity as Governor of the State of Florida**,** <br><br> *Defendant.* | No. 6:23-cv-02303-WWB-RMN |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

At its core this case is about the simple principle that our constitutional system of government—a system that values the right to vote as preservative of all other rights—prohibits those in power—in this case a governor—from engaging in post-hoc nullifications of the fundamental right to vote for purely political or ideological reasons. While post-election purges to ensure ideological conformity exist in authoritarian states, they are at odds with our democratic system of government.

Although the egregious, precedent-shattering actions of Governor Ron DeSantis ("the Governor" or "Defendant") present this Court with some novel legal issues, that in no way means that Plaintiffs do not have a claim. By alleging the Governor's actions were driven by political and ideological disagreement, Plaintiffs plausibly assert violations of the rights of voters to substantive due process and freedom of association and expression, enshrined in the First and Fourteenth Amendments.

1

Most of the arguments in Defendant's motion to dismiss are tied to the false premise that any actions taken to devalue or nullify the effect of the vote after the certification of an election are immune from judicial review. Of course, they are not. The fundamental rights of voters are not so easily eviscerated.

A complaint survives a motion to dismiss if it "state[s] a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 547 (2007). A court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017).

Plaintiffs have asserted the Governor's actions subjected them to real, concrete harms that disadvantaged them. They also allege the Governor committed egregious and norm-breaking constitutional violations. For these reasons, as discussed below, Plaintiffs not only meet the standing requirement but have more than met their burden of stating plausible claims. This Court should deny Defendant's Motion to Dismiss.

## ARGUMENT

### I. PLAINTIFFS HAVE STANDING.

While establishing Article III standing in a pleading requires a plaintiff to allege facts that plausibly show they have (1) "suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant and (3) likely to be redressed by a decision in the plaintiff's favor," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), Defendant only avers Plaintiffs have not suffered an injury in fact.[1] A plaintiff properly identifies an injury

---

[1] Plaintiffs also demonstrate traceability and redressability. Plaintiffs voting related injuries are traceable to Defendant who, by suspending Worrell, is responsible for eviscerating the effect of the votes of both Individual Plaintiffs and many Florida Rising members. And, Defendant can redress the injuries he caused by reinstating Worrell. Compl. ¶ 13.

2

in fact where their pleading includes allegations that show they "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Georgia Assoc. of Latino Elected Officials, Inc. ("GALEO") v. Gwinnett County Bd. of Registration and Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) (internal citation omitted). Here, for the reasons discussed below, both the individual Plaintiffs and Florida Rising have suffered injuries.

### A. Individual Plaintiffs Caicedo and Chowdhury Have Standing.

A person's right to vote is individual and personal, so voters who allege "facts showing disadvantage to themselves as individuals" have standing because "they have alleged a concrete and particularized injury." *GALEO*, 36 F.4th at 1114; *see also Baker v. Carr*, 369 U.S. 186, 208 (1962) (internal quotation omitted) (finding plaintiffs established standing by asserting "a plain, direct and adequate interest in maintaining the effectiveness of their votes."). Accepting as true the facts set forth in the complaint and drawing all reasonable inferences in the plaintiff's favor, *see West*, 869 F.3d at 1296, Defendant's unlawful suspension of Worrell disadvantaged Plaintiffs Caicedo and Chowdhury, and they have sufficiently alleged the Defendant's actions have invaded their legally protected interest in maintaining the effectiveness of their votes.

1. <u>Plaintiffs Have Alleged a Legally Protected Interest.</u>

The Complaint recites factual allegations showing the suspension of Worrell disadvantaged the Individual Plaintiffs by invading their legally protected interests in maintaining the effectiveness of their vote. Compl. ¶¶19-72. Plaintiffs made their voices heard at the ballot box when – together with the overwhelming majority of the Ninth Circuit's voters – they voted to elect Worrell as State Attorney. When Defendant

suspended Worrell for political reasons and replaced her with someone aligned with his views and diametrically opposed to Worrell's platform, he disadvantaged the Individual Plaintiffs by devaluing and debasing their votes. *See, e.g. Reynolds v. Sims,* 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *see also Judge v. Quinn,* 612 F.3d 537, 545 (7th Cir. 2010) (finding plaintiffs demonstrated an actual injury in fact when the governor "curtailed" their voting rights by leaving in place his U.S. senate appointee rather than issuing a writ of election to allow for a special election to fill the balance of the senate term).

Defendant has failed to identify relevant support for his argument that Individual Plaintiffs have not alleged a legally protected interest. Def. Br. 6-11. Many of the cases relied upon are unrelated to voting rights, and therefore have little application in the context of understanding the full scope of "a fundamental political right" that is "preservative of all rights" *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

Equally unavailing is Defendant's claim that Plaintiffs have not suffered an ongoing or imminent injury. Def. Br. 7. The Individual Plaintiffs allege their injuries are not only actual, but ongoing. Compl. ¶¶82, 94. Worrell remains suspended solely due to the Governor's opposition to her policies, which reflect the political preferences of the voters, including Individual Plaintiffs, who elected her. *Cf. Judge*, 612 F.3d at 542-43.

Finally, Defendant also misinterprets the "particularized" requirement for standing, arguing that "each person that voted for Worrell shares these injuries" and "[t]hus, nothing about Plaintiffs'...injuries is unique or 'individual' to them." Def. Br. 10. The fact that 400,000 voters elected Worrell doesn't diminish the specific harm Plaintiffs suffered,

despite it being "widely shared." *See People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) (citing *Spokeo*, 578 U.S. at 339 n. 7) (rejecting defendants' argument of no injury due to universal harm; holding each voter endured specific harm); *see also United States v. Hays*, 515 U.S. 737, 744-45 (1995).

In this regard, Defendant's reliance on *Wood v. Raffensperger* is misplaced. There, plaintiffs had a generalized grievance "undifferentiated and common to all members of the public," *Lujan*, 504 U.S. at 575, because all Americans, whether they voted in the election or resided in Georgia, shared Wood's interest in ensuring the proper administration of a presidential election. 981 F.3d 1307, 1314 (11th Cir. 2020). By contrast, Plaintiffs' interests are specific to them and those like them who (1) were registered to vote, (2) voted in the 2020 election, (3) voted in the State Attorney's race for the Ninth Judicial Circuit, (4) voted for Monique Worrell, and (5) had the value of their votes diminished and devalued by Worrell's subsequent suspension. Thus, the ongoing suspension affected Plaintiffs' actual votes in a "personal and individual way" sufficient to satisfy Article III standing requirements.

2. <u>Dismissing Plaintiffs' Complaint on Standing Grounds Is Inappropriate</u>.

Defendant's assertion that Plaintiffs must show they have the right to have their chosen candidate remain in office once elected to demonstrate injury in fact, Def. Br. 6, not only inaccurately describes Plaintiffs' claim, but it also misstates Plaintiffs' burden. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal…" *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also GALEO,* 36 F.4th 1100, 1113 (2022) (holding that an organization had standing in voting rights case presenting issues of first impression and stating that "if a jurisdictional challenge

5

implicates the merits of the underlying claim, such as here where interpretation of the Voting Rights Act will determine the merits as well as whether Plaintiffs have standing, the proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case").

Here, the Individual Plaintiffs have more than met their burden of demonstrating at the pleading stage that protected voting-related interests under the First and Fourteenth Amendments have been invaded and implicated, resulting in real, concrete, and particularized disadvantage to them. Given that the Individual Plaintiffs have sufficiently alleged injuries in fact that not even the Defendant contests are traceable to him and redressable, this Court should find that the Individual Plaintiffs have standing.

### B. Florida Rising Has Associational Standing.

Florida Rising has associational standing to challenge Defendant's suspension of Worrell on behalf of its members who voted for Worrell and then had their vote nullified.[2] *See supra* section I.A.2. An organization has associational standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Arcia*, 772 F.3d at 1342 (internal citation omitted). Florida Rising meets these three requirements. Further, organizations do not have to list names of individual members in a complaint to establish associational standing, contrary to Defendant's assertion. Def. Br. 12.

1. <u>Florida Rising Meets the Standards for Associational Standing</u>.

---

[2] Florida Rising does not assert that it has organizational standing. *See* Compl. ¶¶ 11-12.

6

Florida Rising is a membership-based organization with members throughout Florida, including members in Orange and Osceola counties who voted for Worrell during the November 2020 election. Compl. ¶12. The Complaint specifies in detail the harm these members have experienced. *Id.* ¶¶71-72, 77-83, 91-95; *see supra* section I.A. Like the Individual Plaintiffs, Florida Rising's members who voted for Worrell satisfy Article III standing requirements. They are residents of Orange and Osceola counties who voted for Worrell and who each have suffered an injury due to the nullification of their individually-held right to vote and will continue to for as long as an unelected appointee remains in office. In other voting rights cases, such as redistricting claims, the Supreme Court recognizes that "a member of an association would have standing to sue in his or her own right when that member resides in the district that he alleges was the product of a racial gerrymander." *Ala. Legislative Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 269 (2015) (quotations omitted). Similarly, Florida Rising's members who voted for Worrell and live in the Ninth Judicial Circuit have standing.

Second, the interests at stake in this case are germane to Florida Rising's purpose. As stated in the Complaint, Florida Rising is an "organization with a mission to increase the voting and political power of marginalized communities," which "has engaged its constituencies to expand democracy by ensuring that every eligible voter in the state is able to exercise their fundamental and constitutionally protected right to vote." Compl. ¶11. The Governor's suspension of Worrell, an elected official who championed criminal legal system reforms and focused on marginalized communities, interfered and continues to interfere with Florida Rising's mission of empowering marginalized voters so they can effectuate change through voting and engaging in the democratic process. Suspending

7

Worrell runs directly counter to Florida Rising's goal of motivating marginalized voters to engage in the political process.

Third, Florida Rising can assert these claims and seek the reinstatement of Worrell on behalf of its members without the participation of individual members in the case. Because Plaintiffs seek declaratory and injunctive relief, a decision in their favor would accrue to their members, and therefore, no individual member needs to join the case. Indeed, when plaintiffs seek injunctive relief, individual participation of the organization's members is "not normally necessary." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (internal citation omitted). Accordingly, courts have generally found that individual members are not required in voting rights cases, and organizations routinely bring constitutional and voting rights claims on behalf of their members. *See e.g. Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1316 (11th Cir. 2021) (individual member participation not required in voting rights case seeking declaratory or injunctive relief); *Alabama State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1337 (N.D. Ala. 2019) (participation of individual members not necessary for a claim brought under Section 2 of the Voting Rights Act).

2. <u>Florida Rising Does Not Need to List Individual Members</u>.

Defendant's assertion that specific members must be named is contrary to both Supreme Court and Eleventh Circuit precedent. In the redistricting context, the Supreme Court found that an organization established associational standing by stating that it operated statewide and had members in almost every county. *ALBC*, 575 U.S. at 270. At the complaint stage, Florida Rising asserted it has members in the impacted counties. The Eleventh Circuit likewise has never held that a party suing as a representative "must

specifically name the individual on whose behalf the suit is brought." *Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999)

Rather than take on this well-established rule, Defendant cites inapplicable cases irrelevant to the questions at issue here. Most of the cases Defendant relies upon concern environmental disputes about speculative harm as opposed to this complaint where plaintiffs have alleged constitutional violations related to particularized harms that have already occurred and are continuing. *See, e.g. Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009) (considering whether an organization still had associational standing following settlement that resolved harm for one member and the remaining member's harm was not concrete or particularized); *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809 (11th Cir. 2023) (issue not considered because a named co-plaintiff was also a member of the organization); *Sierra Club v. Morton,* 405 U.S. 727, 740-741 (1972) (considering the separate issue of particularized harm to members).

Defendant's citations to cases in the voting rights context fare no better. In *Jacobson v. Fla. Sec'y of State*, the Eleventh Circuit reviewed the case following a trial—very different than here—and found not only that the organization had not identified any members at any stage of litigation but also that it had not proved a member will suffer an injury. 974 F.3d 1236, 1249 (11th Cir. 2020). The holding in *Ga. Republican Party v. Sec. & Exch. Comm'n*, also does not apply because the court considered standing following a procedure akin to summary judgment and found the party had not identified members who would suffer harm due to the challenged rule. 888 F.3d 1198, 1204-1205 (11th Cir. 2018). In contrast to both cases, Florida Rising has already stated it has members who voted for Worrell in 2020 and specified their harm in detail. *See* Compl. ¶¶71-72, 77-83,

9

91-95. As such, Plaintiffs' complaint alleges facts sufficient to satisfy Florida Rising's associational standing.

## II. PLAINTIFFS PLAUSIBLY ALLEGE THE GOVERNOR'S REMOVAL OF MONIQUE WORRELL VIOLATED THEIR RIGHTS TO SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

A substantive due process violation occurs when "state officials ... seriously undermine the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. Sept. 28, 1981);[3] *Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020) (affirming district court's finding of a substantial likelihood of success on the merits where plaintiffs alleged state officials violated their due process rights by deciding not to hold a district attorney election). In *Duncan*, Georgia voters challenged state officials' refusal to hold a special election to fill a vacant judgeship as required by the state constitution. 657 F.2d 691. Instead, the governor filled the position via his executive appointment power. The Court held this violated voters' rights to substantive due process, because, while the Fourteenth Amendment "provides no guarantee against innocent irregularities in the administration of state elections," *citing Gamza v. Aguirre*, 619 F.2d 449 (5th Cir. 1980), it does protect against state officials' actions that "seriously undermine the fundamental fairness of the electoral process." *Duncan*, 657 F.2d at 700.

### A. Plaintiffs' Factual Allegations are Well Pleaded.

Plaintiffs allege that, as in *Duncan*, the Governor illegitimately seized voters' power to select an official. Plaintiffs allege he was motivated by "ideological and political disagreements" with Worrell; in fact, he objected to the very policies she trumpeted to

---

[3] Fifth Circuit decisions issued before Oct. 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc).

10

voters during the election campaign. Compl. ¶¶5, 22-24, 26-36, 47. Though the Governor did not intercede to block Worrell's election,[4] Plaintiffs allege he acted under color of state law to suspend Worrell for an unconstitutional reason, and then used his appointment power to replace her with an "ideological ally"—thereby effectively nullifying the results of an election in which Plaintiffs voted for the successful candidate. Compl. ¶71. In other words, the Governor's unlawful actions have denied Plaintiffs the right to see their elected candidate serve their full term, unless disqualified. The Governor tolerated voters' selection for only two-and-a-half years before nullifying the election by removing the duly elected official and replacing her with his preferred state attorney for the balance of the four-year term.

Defendant suggests permitting fact discovery would be catastrophic, "turn[ing] *every* suspension or removal of an elected official under state law into a federal constitutional case." Def. Br. 16-17 (emphasis added). In so doing, he misrepresents Plaintiffs' complaint and overlooks the serious implications of disallowing any claim after election certification. It cannot be that by merely holding an election before unilaterally upending its results, state officials are shielded from any legal action by voters. Such an antidemocratic rule would create a straightforward blueprint for denying voters' federal rights and would reduce the right to merely casting a ballot without protecting its effect. Plaintiffs allege Defendant has already employed that blueprint several times, suspending eight other officials not charged with crimes and replacing them with political allies. Compl. ¶¶56-61.

---

[4] In *Duncan*, multiple state officials conspired to convert the contested judgeship from an elected position to an appointed position. 657 F.2d at 693-95. State officials refused to schedule an election. *Id.* at 695.

While in *Duncan* the state officials' refusal to hold an election precipitated voters' filing their successful substantive due process challenge, the legal principles delineated there apply whether the nullification of the voters' preferences occurs before or after an election.[5] For example, following *Duncan*, the Eleventh Circuit held the Due Process Clause was implicated by the counting of absentee ballots in possible violation of a state law witness requirement, finding this to be a "post-election departure from previous practice" "implicat[ing] fundamental fairness." *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 581 (11th Cir. 1995).

The *Duncan* and *Gamza* Courts were concerned with precisely the type of conduct alleged in the Complaint. The *Gamza* Court found four factors, applied by the *Duncan* Court, that provide guidance in determining whether particular conduct undermines the fundamental fairness and integrity of the electoral process: (1) the nature of the injury; (2) whether the injury was inflicted intentionally or accidentally; (3) whether the injury is part of a pattern that erodes the democratic process; and (4) whether state officials have succumbed to temptations to control elections by corruption and violence. *Duncan*, at 701 (citing *Gamza*, 619 F.2d at 453). Plaintiffs have alleged facts satisfying each of the *Gamza* factors. *See* Compl. ¶¶1 (seriousness of injury); 6, 47-48, 71 (intent to ignore the electorate's will); 56-65 (pattern of conduct eroding democratic process); 66-68 (surrender to temptations to corruptly control and manipulate election outcomes).

---

[5] *Duncan* prohibits actions which "seriously undermine the fundamental fairness of the electoral process," not solely "elections." *Id.* at 657 F.2d at 703 (emphasis added). Ending the "electoral process" immediately after polls close or votes are counted would make democracy more performative than genuine.

12

Aside from the *Gamza* factors, there are other reasons to conclude Worrell's suspension rendered the electoral process fundamentally unfair. First, as described in the complaint, Worrell's suspension is inconsistent with well-established practices that existed prior to Defendant's corrupting of the process for suspending elected officials. *See* Compl. ¶¶63-65; *cf. Griffin v. Burns*, 570 F.2d 1065, 1075-76 (1st Cir. 1978) (finding the Rhode Island Supreme Court's interpretation of statutes regulating absentee ballot procedures at odds with long-standing practice and noting that "[w]hen a group of voters are handed ballots by election officials that, unsuspected by all, are invalid, state law may forbid counting the ballots, but the election itself becomes a flawed process"). Second, replacing an elected official with an appointed one to achieve political goals as done here is patently at odds with our democratic system. *See Tully v. Edgar*, 171 Ill. 2d 297, 305-11 (1996) (holding that legislation removing an elected official midterm "impinges upon the fundamental right to vote" in a way that must satisfy strict scrutiny).

Plaintiffs' allegations that fundamental fairness has been seriously undermined *in this case* rebut Defendant's false assertions that Plaintiffs allege a prohibition on the suspension or removal of any elected official. Rather than "attempt[ing] to codify" voters' right to have their preferred public official maintain their office "despite their performance in office or fidelity to state law" (Def. Br. 15), Plaintiffs allege *this* is a rare case of a suspension of an elected official that occurred purely because of ideological and political disagreements. Compl. ¶49. *See Warren v. DeSantis*, 653 F.Supp.3d 1118, 1135 (11th Cir. 2024) (noting that "a decision to remove or exclude a duly elected official based on protected speech" is "something that might have happened just twice before in the nation's history.").

13

Nor would permitting discovery into the factual background of this specific suspension "*de facto* prohibit the Governor from suspending, or the Senate from removing, any public officials from office." Def. Br. 16. Plaintiffs have plausibly alleged Defendant's suspension of Worrell seriously undermined the fundamental fairness of the electoral process and violated their substantive due process rights based upon facts specific to that suspension. Defendant's attempts to catastrophize the consequences of this Court permitting discovery are inconsistent with Rule 12's liberal pleading standard and the necessary vindication of valid federal claims.

### B. Dismissal of Plaintiffs' Claim at this Stage is Inappropriate.

The determination of whether Defendant's actions seriously undermined the fundamental fairness and integrity of the electoral process—including application of the *Gamza* factors—is a fact-intensive inquiry, 619 F.2d at 453, which is inappropriate for consideration at the motion to dismiss stage. *See Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010).

Further making this case inappropriate for resolution at the motion to dismiss stage, Plaintiffs allege unprecedented conduct by a governor who has engaged in a pattern of abusing his suspension power to nullify election results post-certification—conduct for which there is no legal precedent. Defendant attempts to distinguish *Duncan* by emphasizing that the conduct there took place before vote certification. Def. Br. 15. While asserting a lack of legal precedent to support the application of substantive due process protections to voters post-certification, Defendant fails to cite any relevant authority to support his position that the application of *Duncan* to the post-certification nullification of election results is inappropriate.

In *McGraw v. Banko*, the single, inapposite case Defendant cites, a candidate asserted a substantive due process right in an office she was elected to, but was never eligible for, after her ineligibility was discovered post-election. 2022 WL 19333345 (N.D. Fla. Aug. 12, 2022), *aff'd*, 2023 WL 7039511 (11th Cir. 2023). The district court rejected plaintiff's claim that she was entitled to remain in office on several independent grounds before acknowledging the *Duncan* Court did not address post-election removals in its reasoning. *Id.* Because *Duncan* dealt with the failure to hold a required election rather than the nullification of an election that already took place, the absence of dicta on this point is unsurprising. The Eleventh Circuit found *Duncan* inapposite because state law *barred* McGraw's right to candidacy in a district where she did not reside, whereas, in *Duncan*, state law *required* officials to hold an election. *McGraw v. Banko*, 2023 WL 7039511, at *2 (11th Cir. Oct. 26, 2023). Here, as in *Duncan*, state law guarantees Plaintiffs' right to vote for their preferred candidate, regardless of whether that candidate's views are aligned with the Governor's.

And just because the Defendant's precedent-shattering conduct has resulted in a claim that includes a novel legal question, it does not mean Plaintiffs have failed to state a claim for relief. Quite the opposite, it is "especially disfavored" to dismiss a novel legal theory under Rule 12(b)(6). *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (internal citations and quotations omitted) ("To the extent Plaintiffs' claims do not fall within the four corners of our prior case law, this does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development."). The Middle District of Florida has reasoned that, "[i]n deciding a motion

to dismiss, the Court is tasked not to dismiss a claim raising a novel theory of law." *Stewart Title Guar. Co. v. Title Dynamics, Inc.*, 2005 WL 2548419, at *3 (M.D. Fla. Oct. 11, 2005). Other courts agree that courts "should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme" because "it is important that new legal theories be explored and assayed in the light of actual facts . . ." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (internal citations omitted); *Baker v. Cuomo*, 58 F.3d 814, 818-19 (2d Cir. 1995), *vacated in part on reh'g en banc sub nom. Baker v. Pataki*, 85 F.3d 919 (2d Cir. 1996).

For all the above reasons, this Court should allow Plaintiffs discovery on their substantive due process claim and deny Defendant's motion to dismiss.

### III. PLAINTIFFS PLAUSIBLY ALLEGE THAT THE GOVERNOR'S REMOVAL OF MONIQUE WORRELL VIOLATED THEIR RIGHTS TO ASSOCIATION AND EXPRESSION UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION.

Plaintiffs have sufficiently alleged a First Amendment claim. Compl. ¶¶85-95. Plaintiffs allege Defendant abrogated both their right to association and their right to expression when he corrupted the electoral process by removing voters' candidate of choice over political and policy preferences. "If alignment with DeSantis's political preferences were an appropriate requirement to perform the state attorney's duties, there would be little point in local elections open to candidates across the political spectrum." *Warren*, 90 F.4th at 1135–36.

#### A. Plaintiffs Have Adequately Alleged a Violation of Their Right to Association.

Voting is a protected First Amendment associational right, contrary to Defendant's unsupported assertion. Def. Br. 20. *See, e.g. Clingman v. Beaver*, 544 U.S. 581, 586 (internal quotations omitted) ("[T]he First Amendment, among other things, protects the

right of citizens "to band together in promoting among the electorate candidates who espouse their political views."); *Lyman v. Baker*, 954 F.3d 351, 376 (1st Cir. 2020) (internal citations omitted) ("[B]ecause voters express their preferences at the ballot box ...associational freedom necessarily includes 'the right to cast an effective vote.'").

Defendant further suggests the right to associate does not entitle voters to have their candidate remain in office. Def. Br. 17. As discussed above in section II.A, this both misconstrues and exaggerates Plaintiffs' argument. Plaintiffs make no claim that suspension, standing alone, violates voters' First Amendment rights, explicitly acknowledging in their complaint that under certain circumstances the Governor may suspend elected officials. Compl. ¶¶63-65. Instead, Plaintiffs allege their First Amendment right to association was violated when the Governor suspended their duly elected candidate for ideological and political purposes. Actions burdening associational rights are subject to strict scrutiny and so must serve a compelling governmental interest. *Eu*, 489 U.S. at 225. Replacing electing officials with ideological allies is not a compelling state interest; in fact, it is antidemocratic.

As discussed *supra* section II.B., to the extent that Plaintiffs' claim presents a novel legal theory does not mean they have failed to state a claim; thus, this Court should decline to dismiss it. *Stewart Title Guar. Co.,* 2005 WL 2548419, at *3; *Baker*, 58 F.3d at 818–19; *Wright,* 787 F.3d at 263.

Further, at least three courts have concluded that removing an elected official for political reasons may violate voters' right to association. *See Cartagena v. Crew*, No. CV-96-3399 CPS, 1996 WL 524394, at *1 (E.D.N.Y. Sept. 5, 1996) (acknowledging that laws affecting candidates often impact voters because they are not easily separated and

17

denying defendant's motion to dismiss voters' First Amendment claim); *Alamo v. Crew*, No. CV-96-3400 CPS, 1996 WL 524393, at *10 (E.D.N.Y. Sept. 5, 1996) (same); *Peel v. Crew*, No. 96 CIV. 7154 (RWS), 1996 WL 719378, at *9 FN 2 (S.D.N.Y. Dec. 13, 1996) (Court sua sponte suggested viability of First Amendment claim but dismissed Plaintiff's claim as pleaded, noting the significance of Plaintiffs failure to allege Defendant's suspension was based on their political beliefs or statements).

In a similar context, the Supreme Court found a local union's removal of an elected business agent chilled the free speech rights of the union members who voted for him.

> To begin with, when an elected official ...is removed from his post, the union members are denied the representative of their choice.... Furthermore, **the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged**. **Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him**.... "

*Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 355 (1989) (emphasis added). While *Lynn* is not a First Amendment case, Supreme Court precedent suggests First Amendment free speech restrictions require greater justifications and are more stringent than Title I of the Labor Management Reporting and Disclosure Act (LMRDA). *See United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 111 (1982).

### B. Plaintiffs Have Adequately Alleged a Violation of Their Right to Expression.

To determine whether conduct is expressive, courts look at whether a reasonable person would interpret conduct "as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original). Under this standard, a vote qualifies as expressive speech because a reasonable person would interpret voting as "some sort of message" about the candidate for whom the vote is cast.

Not only is it more than plausible the votes cast for Worrell constituted expressive conduct, there is also good reason to conclude their votes constituted core political speech. Core political speech is "interactive communication concerning political change," *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Core political speech extends to issue-based elections as well as candidates, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), and is subject to strict scrutiny, *Meyer*, 486 U.S. at 420. Defendant regulated core political speech when he suspended Worrell—voters supported a candidate who espoused their viewpoints, viewpoints with which Defendant disagreed, and that served as the basis for Worrell's removal; so, strict scrutiny applies.

While the Eleventh Circuit and the Supreme Court have not addressed whether voting is either expressive conduct or core political speech, several courts have affirmatively stated voting does constitute either political expression or expressive conduct. *See, e.g.*, *Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994) ("Voting on legislative resolutions expressing political viewpoints ...are simply the expression of political opinion."); *Miller v. Town of Hull, Mass.*, 878 F.2d 523, 532 (1st Cir. 1989) (noting that the act of voting by a member of a public agency or board "comes within the freedom of speech guarantee of the first amendment."); *Rosen v. Brown*, 970 F.2d 169, 175 (6th Cir. 1992) ("An election ballot is a State-devised form through which candidates and voters are required to express themselves"); *Dixon v. Maryland State Admin. Bd. of Election L.*, 878 F.2d 776, 782 (4th Cir. 1989) *abrogated in part by Burdick v. Takushi*, 504 U.S. at 428 (1992) (holding that the refusal to report votes made for certain candidates took away these voters' right of political expression); *Wright v. Mahan*, 478 F. Supp. 468, 473 (E.D.

Va. 1979), aff'd, 620 F.2d 296 (4th Cir. 1980) (value of political expression diminished if it does not include the right to cast a ballot).

Defendant's cited cases do not stand for the proposition that voting is not core political speech nor expressive conduct—while they provide examples of what constitutes core political speech or expressive conduct, none state that *voting is not* within the ambit of political speech or expressive conduct. Defendant's reliance on *VoteAmerica v. Raffensperger*, No. 1:21-CV-01390-JPB, 2023 WL 6296928, at *8 (N.D. Ga. Sept. 27, 2023) for the proposition that voting is not core political speech falls short because while describing what political speech is, it notes the list is not exhaustive. *Id.* (emphasis added) (Core political speech "*includes, but is not limited to....*"). In the plainest sense, a vote is an interactive communication for political change. Thus, Plaintiffs have adequately stated a First Amendment claim.

## CONCLUSION

Plaintiffs' complaint alleges injuries-in-fact sufficient to establish Article III standing, and sufficiently pleads Plaintiff Florida Rising's associational standing. Further, the complaint adequately pleads valid claims supported by applicable legal principles. This Court should deny Defendant's motion to dismiss on all counts.

Respectfully submitted this 23rd day of February, 2024,

      /s/ *Matletha Bennette*
Matletha Bennette, Fla. Bar No. 1003257
SOUTHERN POVERTY LAW CENTER
PO Box 10788, Tallahassee, FL 32302-2788
matletha.bennette@splcenter.org