## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DAVID CAICEDO; RAJIB
CHOWDHURY; and FLORIDA RISING
TOGETHER, INC.,

    *Plaintiffs*,

v.

**Case No. <u>6:23-cv-02303-WWB-RMN</u>**

RON DESANTIS, individually and in his
official capacity as Governor of the State
of Florida,

    *Defendant*.

---

## <u>FIRST AMENDED COMPLAINT</u>

### Declaratory Relief Requested

1.    While the authority to suspend an elected official can be a legitimate tool to ensure accountability, Governor Ron DeSantis has used his power of suspension to target his political adversaries and to override the will of the electorate. He has communicated to voters through his actions and words that their vote only will be given full effect if they vote for candidates whom he finds politically and ideologically acceptable. In so doing, the Governor has undermined the fundamental

fairness and integrity of the electoral process and infringed on the right of voters to express their preferences and associate with one another in support of a candidate.

2.      In 2020, residents of the Ninth Judicial Circuit, Florida's third largest judicial circuit encompassing Orange and Osceola counties, rallied behind and cast their ballots for Monique Worrell, a former public defender and law professor, who ran as a reform-minded candidate for State Attorney.

3.      Ms. Worrell's pledge to implement a series of policies geared toward achieving a fairer, more equitable criminal legal system and a safer community inspired voters. The reforms she championed included holding police officers accountable, curtailing the use of cash bail, expanding programs to divert children and adults away from jail and prison, and addressing mental health and substance abuse issues.

4.      David Caicedo and Rajib Chowdhury each cast their ballots in support of Worrell and her reforms.

5.      Florida Rising—an organization dedicated to building the political power of historically marginalized communities by organizing multi-racial movements to win elections—was at the forefront of the movement to galvanize voters to elect Ms. Worrell. Florida Rising organized its members in support of Ms. Worrell and issued an endorsement of her candidacy.

6.     Ms. Worrell achieved a resounding victory, garnering nearly 67% of the vote. A total of 395,979 voters associated with each other to express their support and vote for Ms. Worrell and the policies she championed.

7.     Upon assuming office on January 5, 2021, Ms. Worrell moved forward with implementing many of her campaign promises, by—among other measures—adopting new policies for improving the reliability of the government's law enforcement witnesses, tracking instances of officer misconduct, expanding diversion programs, and creating specialized units addressing the root causes of crime in the community, such as substance abuse.

8.     Shortly after Ms. Worrell, a Democrat, began her term in office, Governor DeSantis, a Republican, opposed her reform agenda for political and ideological reasons. In the aftermath of Ms. Worrell's election, Governor DeSantis expressed his strong opposition to her policies, launched investigations into her prosecutorial decisions, and used the bully pulpit of the governorship to distort her record on combating crime.

9.     On August 9, 2023, Governor DeSantis suspended Ms. Worrell from office. The Governor asserted that he suspended Ms. Worrell for "neglect of duty" and "incompetence," but the Governor never identified any actual malfeasance, improprieties, or gross failures that could credibly qualify as either "neglect of duty"

or "incompetence." Rather, he suspended Ms. Worrell because of his hostility toward her ideologically different approach to enforcing the state's criminal laws.

10.    Ms. Worrell is not the first elected politician that Governor DeSantis has targeted for suspension for political reasons.  The Governor has a history of corrupting the democratic process by wielding his authority to suspend elected officials associated with the Democratic Party, especially when they openly disagree with him on policy positions.

11.    In the days and weeks following her suspension, anger and frustration reverberated throughout the Ninth Judicial Circuit. Plaintiffs Caicedo and Chowdhury and many other voters who had supported Ms. Worrell well understood that Governor DeSantis had suspended Ms. Worrell for political and ideological reasons. Many voters were discouraged and began to question whether they could affect change through their vote. Florida Rising mobilized and diverted resources to respond to these concerns.

12.    This lawsuit seeks declaratory relief and punitive damages to affirm that, by removing Ms. Worrell from her position as State Attorney for the Ninth Judicial Circuit on pretextual grounds, Governor Ron DeSantis effectively disenfranchised the Plaintiffs in violation of rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

13.     Plaintiffs also seek compensatory damages for the diversion of resources necessitated by Defendant's unconstitutional actions. Plaintiff Florida Rising spent time, funds, and effort on extensive campaigns, outreach programs and educational initiatives to counteract the community impact of the Governor's suspension of Ms. Worrell. This burden persists. Florida Rising faces an increased obligation to uplift a community left despondent by the fundamental unfairness and chilling effects of having their vote nullified, requiring compensation for ongoing operational demands and resource expenditures.

## PARTIES

14.     Plaintiff David Caicedo is an Orlando resident who voted for Ms. Worrell in 2020.

15.     Plaintiff Rajib Chowdhury is an Orlando resident who voted for Ms. Worrell in 2020.

16.     Plaintiff Florida Rising Together, Inc. ("Florida Rising") is an organization with a mission to increase the voting and political power of marginalized communities. Since its founding, Florida Rising has engaged its constituencies to expand democracy by ensuring that every eligible voter in the state is able to exercise their fundamental and constitutionally protected right to vote. In furtherance of its goals, Florida Rising actively engages in voter registration, education, engagement, and election protection programming.

17.     Florida Rising's members include residents of Orange and Osceola counties who voted for Ms. Worrell during the November 2020 election.

18.     Florida Rising endorsed Ms. Worrell's campaign. In preparation for and in response to Ms. Worrell's suspension, Florida Rising diverted resources to encourage and uplift the community and to keep residents updated about the suspension.

19.     Defendant Ron DeSantis currently serves as the Governor of the State of Florida. He is sued in his individual and official capacities. Governor DeSantis suspended Ms. Worrell from the position of state attorney pursuant to Art. IV, § 7(a) of the Florida constitution and acted under color of state law at the time of the suspension. Governor DeSantis has the power to reinstate Ms. Worrell at any time prior to her suspension from office. Fla. Const. Art. IV, § 7(a).

## JURISDICTION AND VENUE

20.     This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1357 as well as 42 U.S.C §§ 1983 and 1988 because this action arises under the Constitution and laws of the United States.

21.     This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure to grant the relief requested.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

23.     This action is properly filed in the Orlando Division pursuant to Local Rule 1.04(b) because the action is most directly connected with this Division, and it is most conveniently advanced there.

24.     The Court has personal jurisdiction over the Defendant.

## FACTUAL ALLEGATIONS

**A. Orange and Osceola voters banded together to support and elect a reform-minded prosecutor.**

25.     When Monique Worrell announced her candidacy with a promise to reform the criminal legal system in Orange and Osceola counties, she received overwhelming support from the community.

26.     She pushed an ambitious reform agenda. She promised to focus on solution-based justice, prioritize public safety, actively engage the community, advocate for legislative change, and work to reduce mass incarceration.

27.     She pledged to implement policies that would hold police officers accountable, curtail the use of cash bail, expand programs to divert children and adults away from jail and prison, and partner with community programs to address mental health and substance abuse issues.

28.     Local racial justice organizations that have advocated for much-needed reforms to the criminal legal system actively supported Ms. Worrell's campaign.

29.    Local officials, community groups, and newspapers enthusiastically endorsed her.

30.    In its endorsement of Ms. Worrell, the *Orlando Sentinel* stated that Ms. Worrell "wants punishment to be defined more by fairness and less by how many people you lock up, particularly people who commit non-violent crimes." The paper also noted that Ms. Worrell wanted to try "harder to understand and change the root cause of crime" and designed her campaign around solving problems.

31.    Plaintiff Florida Rising's members voted to endorse Ms. Worrell for State Attorney. The endorsement was based on a questionnaire to candidates about Florida Rising's members' priorities and where the candidate stood on those issues.

32.    Florida Rising announced its endorsement on social media, encouraged supporters to vote for her, and began field work to support her candidacy. For a period of almost three months, Florida Rising canvassed to spread the word about Ms. Worrell.

33.    Plaintiff Caicedo was inspired by Ms. Worrell's commitment to people. He supported her policies for bail reform and decarceration.

34.    Throughout Ms. Worrell's campaign, Mr. Caicedo attended various rallies within the Orlando community. He specifically recalls seeing Ms. Worrell speak at City Hall in Orlando and being inspired by what she said.

35.     Mr. Caicedo cast his ballot for Ms. Worrell because he wanted to see a State Attorney take a more holistic approach to the criminal legal system rather than focusing solely on incarceration.

36.     Around the time of Ms. Worrell's campaign for State Attorney, Plaintiff Chowdhury was a volunteer legislative intern for a Florida state representative with political ideologies aligned with Ms. Worrell's. Though Mr. Chowdhury never directly interfaced with Ms. Worrell's campaign, much of his volunteer work overlapped with criminal legal system reform advocacy. His direct interaction with families and incarcerated individuals contributed toward his interest in criminal legal system reform.

37.     Mr. Chowdhury spent significant time canvassing the Orlando community speaking with constituents about progressive platforms and candidates, including Ms. Worrell. This helped shape his support for Ms. Worrell's campaign.

38.     He cast his ballot for Ms. Worrell because he was inspired by her promise to find alternate ways to reduce recidivism in the juvenile justice system.

39.     Both Plaintiffs Caicedo and Chowdhury voted for Ms. Worrell over other candidates because she represented the ideologies and preferences that they wanted to see in the State Attorney role, such as advocacy for police reform and police accountability. These issues were important to them as voters and as Orlando residents.

40.     Plaintiffs Caicedo and Chowdhury associated with each other and other voters who helped elect Ms. Worrell. They were sending a message about their desire for reform of the criminal legal system when they cast their ballots for Ms. Worrell.

41.     During the November 2020 election, voters in Florida's Ninth Judicial Circuit overwhelmingly supported Ms. Worrell's reform agenda. Nearly 400,000, or almost 67% of voters cast their ballot for Ms. Worrell.

**B. Ms. Worrell delivered on her campaign promises that inspired voters and secured her election**.

42.     Upon entering office, Ms. Worrell followed through on many of the commitments she had made to the voters who had supported her.

43.     She established a task force to work with community partners to identify alternatives to incarceration for those charged with offenses related to homelessness. She also created a community prosecution program to work with community partners to reduce incidences of crime and improve residents' quality of life.

44.     Ms. Worrell implemented new policies designed to prevent officers lacking in credibility from testifying. Specifically, she created a "Brady database," named for the landmark case *Brady v. Maryland*, 373 U.S. 83 (1963), to aggregate data from multiple sources to identify unreliable officers and disqualify them from testifying.

45.     She created a procedure regarding investigations into officer-involved incidents to ensure transparency and integrity in the process.

46.     She also focused on devising innovative approaches to combatting violent crime. She jointly applied for funding with the Orlando Police Department for a grant to reduce gun violence; she partnered with community and law enforcement on a Gang Task Force; and she created a special team tasked with handling and resolving violent crime in Orange and Osceola counties.

47.     She formed a narcotics unit to combat an increase in fentanyl overdoses. The unit conducted targeted prosecutions and provided alternatives to incarceration.

48.     She reduced the use of direct file—a process by which the state transfers juvenile cases to adult court for the most serious offenses—to bring a rehabilitative approach to the juvenile legal system.

49.     Ms. Worrell created a six-month pilot diversion program for adults with first-time misdemeanor charges to test the efficacy of the program. She also created a mental health unit aimed at addressing the needs of individuals suffering from mental illness.

50.     In 2022, she relaunched the "Power of the Prosecutor Podcast," a podcast where she had monthly conversations with local officials and community

members about community engagement, victim advocacy, and the criminal legal system.

51.     During Ms. Worrell's brief tenure in office, the crime rates in Osceola and Orange counties improved. Florida Department of Law Enforcement data shows that crime rates in the Ninth Judicial Circuit dropped by nearly 10% in 2021 compared to 2020. Murders dropped about 13% during the same period. The crime rate in Orange and Osceola counties dropped 9% and almost 11%, respectively.

52.     In August 2023, just before Ms. Worrell's suspension, the Chief of Police of Orlando, the largest city in the Ninth Judicial Circuit, said that violent crime was down 10% compared to 2022 and shootings were down 30% from the prior year.

**C. Governor DeSantis suspended Ms. Worrell for doing nothing more than exercising her prosecutorial discretion, a discretion that was used to implement the policies that voters supported.**

53.     Governor DeSantis targeted Ms. Worrell for following through on the promises she had made to the voters who had elected her. Governor DeSantis directed his general counsel to request information from Ms. Worrell's office about individual cases and her office's charging decisions.

54.     In February 2023, Governor DeSantis's general counsel sent a letter to Ms. Worrell's office, initiating inquiries into cases which her office chose not to

prosecute. In response, Ms. Worrell issued a press release attempting to correct misconceptions and insinuations that her policies promoted crime.

55.    In March 2023, Ms. Worrell released data demonstrating she did not prosecute any fewer cases than two of her predecessors.

56.    Given the Governor's suspension of another state attorney in Hillsborough County less than a year prior and the recurring pattern of inquiries from the Governor into the office's reforms, concerns emerged throughout Orange and Osceola counties about Ms. Worrell's potential suspension.

57.    Amidst growing rumors that Governor DeSantis might take action, community organizations, including Plaintiff Florida Rising, initiated strategies for effectively disseminating information to the community.

58.    In March 2023, Florida Rising developed Wake-Up Wednesdays! in direct response to the Governor's investigation into Ms. Worrell's office. According to its website, Wake-Up Wednesdays! is a "bold, people-centered grassroots effort and digital media strategy, designed to dismantle Ron DeSantis' hateful agenda, life threatening rhetoric and anti-American politics, policies and practices that attempt to dehumanize Black bodies, immigrants, women school-age children and members of the LGBTQIA+ community."

59.    In May 2023, the *Orlando Sentinel* Editorial Board published an editorial forecasting that Governor DeSantis's vendetta against Ms. Worrell would

lead to her suspension and undermine not only voters but the process of justice in Orange and Osceola counties.

60.     On August 9, 2023, Governor DeSantis issued Executive Order 23-160 suspending Ms. Worrell and naming Andrew Bain as her successor.   Governor DeSantis had appointed Mr. Bain, then a Republican, to the bench in 2020.

61.     In his Executive Order, Governor DeSantis stated that "during Ms. Worrell's tenure in office, the administration of criminal justice in the Ninth Circuit has been so clearly and fundamentally derelict as to constitute both neglect of duty and incompetence."

62.     These statements thinly veil the pretext for the Order. Early drafts and the lack of evidence reveal the Order was prompted by the Governor's ideological and political disagreements with Ms. Worrell and his opposition to how she was exercising her prosecutorial discretion.

63.     For instance, early drafts of the Order reference George Soros, who provided funding to Democratic candidates, including Ms. Worrell. In presidential fundraising emails and in speeches, Governor DeSantis has boasted that he is the "only elected official in America to remove a 'progressive' Soros-funded district attorney," a reference to his suspension of Andrew Warren, who also was backed by George Soros.

64.     Although the final draft of Governor DeSantis's Executive Order did not include this reference to Soros, his political motivations for removing Ms. Worrell from office are nevertheless clear.

65.     And while the order accused Ms. Worrell of "incompetence" and "neglect of duty," it failed to identify a single instance of abuse of prosecutorial discretion, malfeasance, or misconduct. Instead, the order included generalized complaints about Ms. Worrell's policies and practices—the same policies and practices that were instrumental in her election and reflected the systemic changes that voters desired and supported.

66.     In fact, the evidence cited to support allegations of neglect and incompetence represent common exercises of prosecutorial discretion for reform-minded prosecutors.

67.     The Florida Constitution provides that a state attorney has complete discretion in deciding whether and how to prosecute.

68.     Prosecutorial discretion is so intrinsic to the legal system that both the Florida Rules of Professional Conduct and the American Bar Association provide for the special responsibilities of a prosecutor in exercising this discretion.

69.     The commentary to Rule 4-3.8 of the Florida Rules of Professional Conduct requires a prosecutor to act as "a minister of justice" and states that the

systematic abuse of prosecutorial discretion violates the Rules of Professional Conduct.

70.     Likewise, Standard 3-1.2 of The American Bar Association Standards for the Prosecution Function ("ABA Standards") provides that a prosecutor is both "an administrator of justice" and a "zealous advocate" that should "exercise sound discretion and independent judgment." Moreover, the Standard specifies that the duty of the prosecutor is to "seek justice within the bounds of the law, not merely to convict."

71.     This is because:

> [P]rosecutor[s] serve the public interest and should act with integrity and balanced judgment to increase public safety both by pursuing appropriate criminal charges of appropriate severity, and by exercising discretion to not pursue criminal charges in appropriate circumstances. The prosecutor should seek to protect the innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants.

72.     Standard 3-1.2 further states that prosecutors should develop alternatives to prosecution where appropriate, be problem-solvers that consider the "broad goals of the criminal justice system," and "seek to reform and improve the administration of criminal justice" when they are aware of "inadequacies and injustices" in the law.

73.     By following through on her campaign promises to reform the criminal legal system, Ms. Worrell was doing nothing other than meeting her professional and ethical obligations and exercising her prosecutorial discretion.

74.     By appointing Mr. Bain—his ideological ally—to replace Ms. Worrell, Governor DeSantis overrode the will of the voters, substituting his policy preferences for theirs. Among other measures, Mr. Bain initially suspended all of the Ninth Judicial Circuit's diversion programs other than pretrial diversion through state or county probation and promised to review cases that Ms. Worrell's office had previously declined to prosecute.

**D. Florida Rising invested significant resources after the suspension of Ms. Worrell to support the community.**

75.     In response to the Governor's suspension of Ms. Worrell, Florida Rising stepped into action as a resource to their members and the Orlando and Osceola community at-large.

76.     Between March 2023 and September 2023 alone, Florida Rising estimates they spent at least 360 hours of staff time in combating and communicating about Governor DeSantis's impending suspension of Ms. Worrell.

77.     When Governor DeSantis announced her suspension, members flooded Florida Rising's Orlando office with messages and phone calls to express outrage and frustration with Ms. Worrell's suspension. Voters and Florida Rising members expressed to Florida Rising organizers that they felt as if their votes did not matter

and that they were not heard. An overwhelming number of callers believed the suspension to be a flagrant abuse of power.

78.    In order to organize the hundreds of comments and concerns, Florida Rising joined forces with other community groups to poll concerned citizens, asking questions such as, "How does this affect you?" and "What should next steps be?"

79.    Overwhelmingly, members felt there should be, at minimum, a press conference calling out Governor DeSantis's abuse of power.

80.    Within 24 hours of Worrell's suspension, Florida Rising diverted all their resources to host a press conference for their members and the Orlando community. The day after Ms. Worrell's suspension, hundreds of supporters—many of the same groups and individuals who supported Ms. Worrell's candidacy and reform-minded policies—gathered outside Orlando City Hall to rally against what many called a threat to democracy.

81.    Florida Rising joined 13 statewide organizations, 8 elected officials, notable community leaders and members of the community to raise awareness, call out an attack on democracy, and garner support and hope for Ms. Worrell's re-election in 2024.

82.    Attendees of the event called for Ms. Worrell's reinstatement, citing an abuse of power and their right to democracy. Members of the community expressed

fear and anxiety that Governor DeSantis would negate their voting choices in the future.

83.     One of Ms. Worrell's supporters made clear that Governor DeSantis's decision to suspend Ms. Worrell undermined the democratic process— "The idea is to be left up to the voters to make that decision, not for somebody for cheap political gain to remove somebody. But obviously we're not gonna get that chance this year. My vote, when I voted for her three years ago, has been disregarded. It's been thrown away. I don't count anymore."

**E. The suspension of Ms. Worrell disenfranchised voters.**

84.     Voters, including Plaintiffs, have an expectation and a right to ensure that their vote will count, and when a governor undermines elections in this way, it diminishes the incentive to vote.

85.     Plaintiffs Caicedo and Chowdhury were among the Orange County residents who felt disenfranchised by Worrell's suspension. They banded together with other voters to promote the candidate—here, Ms. Worrell—that best espoused their political views.

86.     They engaged in political expression when they voted for Ms. Worrell and were sending a message that they supported Ms. Worrell and reform of the criminal legal system in the Ninth Judicial Circuit.

87.     Plaintiffs felt their vote was nullified when the Governor suspended their duly-elected official and replaced her with a person who did not share the progressive platform they had supported—a person who, in fact, immediately rescinded some of the policies they had supported.

88.     Plaintiffs contend that Governor DeSantis targeted Ms. Worrell. As voters in the Ninth Judicial Circuit and residents of a state where the Governor irresponsibly wields his suspension powers, they express fear and concern about the undermining of the democratic process and its implications for future elections.

89.     Mr. Chowdhury was deeply upset by Governor DeSantis's suspension of Ms. Worrell. The day after her suspension, he attended a community protest on the steps of Orlando City Hall to voice his frustrations.

90.     Mr. Chowdhury and Mr. Caicedo are concerned that voting for candidates with progressive policies in the future may inevitably lead to their suspension by Governor DeSantis. They believe the Governor's personal biases are being forced upon people who vote for a reform-minded candidate. They did not vote for the Governor to enforce law enforcement policies. They voted for Ms. Worrell.

**F. The Governor's pattern of retaliating against and suspending duly elected officials who disagree with him and his history of corruptly controlling and manipulating election outcomes exacerbates Plaintiffs' concerns for future elections.**

91.     Plaintiffs know that Governor DeSantis has a history of targeting elected officials who disagree with him on policy positions, which exacerbates their concerns for future elections.

92.     Governor DeSantis chooses which elections to negate through suspension based on the political leanings of the prevailing candidate. By his own words, he targets those that are "Soros-funded."

93.     In May, Governor DeSantis told his supporters at a dinner that while he only earned 50% of the vote, it "entitled [him] to wield 100 percent of the executive power."

94.     Almost a year to the day before he suspended Ms. Worrell, Governor DeSantis used his executive power to suspend another state attorney, Andrew Warren. As in this case, Governor Santis's suspension order included allegations of "neglect of duty" and "incompetence." A federal judge found, however, that Governor DeSantis suspended Mr. Warren solely for political and ideological reasons such as Mr. Warren's "advocacy of positions consistent with the reform-prosecutor viewpoint" and his "affiliation with and receipt of campaign funding from the Democratic Party and, indirectly, from Mr. Soros."

95.     In addition to Ms. Worrell and Mr. Warren, Governor DeSantis has suspended seven other elected officials who were not facing charges: a sheriff, a school superintendent, an elections supervisor, and four school board members.

96.     Six of these seven officials were Democrats, making a total of eight elected Democratic officials suspended primarily over political differences.

97.     Governor DeSantis replaced all eight of these elected Democratic officials with Republicans.[1]

98.     While he has targeted Democratic officials, Governor DeSantis has protected his Republican allies, even when they have clearly engaged in malfeasance. For instance, when the Florida Department of Law Enforcement found that Gregory Tony—Governor DeSantis's Republican replacement for Broward's elected Democratic Sheriff—repeatedly lied on his law enforcement applications, Governor DeSantis failed to act.

99.     This pattern of politicizing suspensions is norm shattering. Former Governor Rick Scott, who served two four-year terms, suspended fifteen elected officials from office, only one of whom was not charged with a crime.

100.    Former Governor Jeb Bush, who served two four-year terms, suspended seventeen elected officials, only one of whom was not charged with a crime.

---

[1] Governor DeSantis appointed Wendy S. Link to replace Palm Beach County Supervisor of Elections Susan Bucher. While Link has switched her party affiliation since assuming office, she was a lifetime Republican at the time of her appointment.

101.    Former Governor Charlie Crist, who served one four-year term, suspended thirteen elected officials from office, all of whom were charged with crimes.

102.    In addition to his unprecedented wielding of executive power, Governor DeSantis and his allies have originated and passed a raft of laws and regulations geared toward making it disproportionately harder for those supporting the Governor's political opponents to vote and participate in the electoral process.

103.    In 2019, Governor DeSantis and state Republican leaders passed a law that undermined the historic passage of a 2018 constitutional amendment abolishing the permanent disenfranchisement of people convicted of most felonies. Multiple polls showed a clear majority of Floridians supporting the amendment, which passed by an overwhelming 65% of the vote. With the stroke of his pen, Governor DeSantis signed a law disregarding the voters' choice and effectively *re*-disenfranchising hundreds of thousands of people with felony convictions.

104.    In 2021 and 2022, Governor DeSantis signed two controversial voting bills that reduced access to voting. One of the laws also used unprecedented authority to establish Florida's Office of Election Crimes and Security, a state agency designed to prosecute election crimes despite no evidence of widespread voter fraud.

105.   In early 2022, Governor DeSantis crafted a new law as a response to a political dispute with Disney, using regulatory powers to punish opposing political speech.

106.   In that same year, he used his influence to move a highly partisan redrawing of congressional boundaries through the state legislature, dismantling districts represented by Black Democrats and diluting the voices of people of color.

## CLAIMS FOR RELIEF

### COUNT ONE

**Infringement of Voters' Right to Due Process
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

107.   Plaintiffs reallege and reincorporate by reference paragraphs 1-106 above.

108.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, enforceable against state officials acting under color of law pursuant to 42 U.S.C. § 1983, prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."

109.   A substantive due process violation occurs when persons acting under color of state law seriously undermine the fundamental fairness and integrity of the electoral process. *See Duncan v. Poythress*, 657 F.2d 691, 699-700 (5th Cir. 1981)

("The due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."); *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967) (invalidating an election for lacking integrity).

110.   Four factors cited in *Gamza v. Aguire* provide guidance as to whether an election related injury undermines the fundamental fairness and integrity of the electoral process: (1) the nature of the injury; (2) whether the injury was inflicted intentionally or accidentally; (3) whether the injury is part of a pattern that erodes the democratic process; and (4) whether state officials have succumbed to temptations to manipulate or control elections by corruption or violence. 619 F.2d 449, 453 (5th Cir. 1980).

111.   Governor DeSantis's intentional nullification of election results has undermined the fundamental fairness and integrity of the electoral process.

112.   The nature of the injury in this case is egregious. As described *supra*, Governor DeSantis's actions deprived the Plaintiffs, as well as nearly 400,000 similarly situated voters, of their fundamental right to an effective vote and threatens the integrity of the state's democratic system.

113. Removing an elected prosecutor for political reasons poses an especially acute threat to Florida's democratic practices. Independent prosecutors

prevent the erosion of democratic norms by acting as a check on both the legislative and executive branches, ensuring no single branch becomes too powerful.

114.   The Governor's words, including his stated explanation for suspending Ms. Worrell, and his actions, including his appointment of a replacement who rejects the policies favored by Ms. Worrell and her supporters, demonstrate that he intended to negate the will of the electorate.

115.   Governor DeSantis's suspension of Ms. Worrell is part of a pattern of conduct that has eroded the democratic process. On nine occasions, he has rejected the results of democratic elections, shunting aside duly elected leaders over policy differences.

116.   Governor DeSantis's suspension of Ms. Worrell is especially suspect because of his history of corruptly manipulating or controlling elections. He has led efforts to enact state laws and rules that foreseeably suppress and dilute the votes of those who disproportionately support of his political opponents.

117.   Defendant Governor DeSantis, acting under color of state law, is depriving Plaintiffs of a right secured by the laws of the United States, namely their right to substantive due process.

118.   Plaintiffs have suffered injuries that the relief requested below would remedy.

## COUNT TWO

**Infringement of Voters' Rights to Association and Political Expression
in Violation of the First Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

119.   Plaintiffs reallege and reincorporate by reference paragraphs 1-106.

120.   The First Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment and enforceable against state officials acting under color of law pursuant to 42 U.S.C. § 1983, protects both political association and political expression.

121.   The right of association stems from the U.S. Supreme Court's recognition that advocacy is advanced, particularly on controversial points of view, by group association. *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). See also, e.g. *Clingman v. Beaver,* 544 U.S. 581, 586 (internal quotations omitted) ("[T]he First Amendment, among other things, protects the right of citizens "to band together in promoting among the electorate candidates who espouse their political views."); *Lyman v. Baker*, 954 F.3d 351, 376 (1st Cir. 2020) (internal citations omitted)("[B]ecause voters express their preferences at the ballot box . . . associational freedom necessarily includes 'the right to cast an effective vote.'").

122.   The right to associate includes a voter's right to select a "standard bearer who best represents the party's ideologies and preferences.'" *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989). Actions

burdening associational rights are subject to strict scrutiny and must serve a compelling governmental interest.

123.   To determine whether conduct is expressive, courts look at whether a reasonable person would interpret conduct "as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original)

124.   Citizens intend to send "some sort of message" when casting a ballot for their preferred candidate and engage in expressive conduct protected under the First Amendment. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("no right is more precious in a free country than that of having a voice in the election of those who make the laws"); *Norman v. Reed*, 502 U.S. 279, 288 (1992) (noting that the right to vote "advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *Doe v. Reed*, 561 U.S. 186, 194-95 (2010) ("An individual expresses a view on a political matter when he signs a petition . . ."); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 134 (2011) (Alito, J., concurring) ("cast[ing] a vote in a straw poll on an important proposal pending before a legislative body . . . indisputably constitutes a form of speech"); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 425 (2010) (Stevens, J., concurring) ("voting is, among other things, a form of speech").

28

125.   The expressive nature of the fundamental right to vote is nowhere more apparent than when it involves a publicly announced and communicated election outcome where voters have unambiguously expressed and given voice to their political opinions.

126.   Aside from expressive conduct, voters casting a ballot for their preferred candidate constitutes core political speech. Core political speech is "interactive communication concerning political change," *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Core political speech extends to issue-based elections as well as candidates, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), and is subject to strict scrutiny. *Meyer*, 486 U.S. at 420. Thus, efforts to limit or negate rights to free speech and free association can only survive constitutional scrutiny if they serve a compelling governmental interest. *Id.*

127.   Plaintiffs engaged in their right to associate with other like-minded voters and with their preferred candidate when they voted for Ms. Worrell.

128.   Plaintiffs likewise engaged in both expressive conduct and core political speech when they cast their votes for Ms. Worrell, a reform-minded prosecutor, and their votes contributed to her resounding electoral victory.

129.   Governor DeSantis abrogated Plaintiffs' associational and expressional First Amendment rights when he abused the suspension authority accorded to him under Florida law. In his executive order, he articulated pretextual reasons for setting

aside the results of a fair and free election, an election overwhelmingly carried by Ms. Worrell.

130.    Defendant Governor DeSantis, acting under color of state law, is depriving Plaintiffs of rights secured by the laws of the United States, namely, their rights to political association and political expression guaranteed under the First Amendment of the U.S. Constitution.

131.   Plaintiffs have suffered injuries that the relief requested below would remedy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a.  Declare that Executive Order 23-160 violates the Fourteenth Amendment to the U.S. Constitution;

b.  Declare that Executive Order 23-160 violates the First Amendment to the U.S. Constitution;

c.  Award punitive damages to all Plaintiffs to deter future unconstitutional action by the Defendant;

d.  Award compensatory damages to Plaintiff Florida Rising for the diversion of resources in response to the Defendant's unconstitutional actions;

e.  Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and,

f.  Grant Plaintiffs such additional and further relief as this Court deems just and proper.

DATED: June 28, 2024                     Respectfully submitted,

 /s/ *Matletha Bennette*
Matletha Bennette, Fla. Bar No. 1003257
Krista Dolan, Fla. Bar No. 1012147
SOUTHERN POVERTY LAW CENTER
PO Box 10788
Tallahassee, FL 32302-2788
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard,* Ga. Bar No. 342209
Avner Shapiro,* DC Bar No. 452475
Courtney O'Donnell,* Ga. Bar No. 164720
Jack Genberg, Fla. Bar No. 1040638
SOUTHERN POVERTY LAW CENTER
150 E Ponce De Leon Ave Ste 340
Decatur, GA 30030-2553
bradley.heard@splcenter.org
avner.shapiro@splcenter.org
courtney.odonnell@splcenter.org
jack.genberg@splcenter.org

*Admitted Pro hac vice*

**Attorneys for Plaintiffs**

31